GLAZEBROOK'S EX'ORS

*v.*

HARVEYS & WILLIAMS, &c.

(*Special Court of Appeals of Virginia, October, 1877.*)

[Virginia Law Journal, 1877, p. 625.]

**Partnership—Settling Accounts—Action at Law or Suit in Equity against Personal Representation.**

In Virginia, under § 13, ch. 144 of the Code of 1860, an action at law upon an unsettled account with a partnership can be maintained against the personal representative of a deceased partner; but this statute is permissive and the creditor may still proceed in equity, which is generally a more convenient and complete remedy.

**Same—Retiring or Deceased Partner—Liability for Subsequent Dealings.**

The liability of the retiring partner, and the estate of a deceased partner are identical, as to acts done and obligations already incurred, but neither is liable for the subsequent dealings of the remaining or surviving partner, except so far as may be necessary for him to settle and liquidate existing demands or to complete some transaction commenced during the existence of the partnership. Neither can be bound by any new transaction of the remaining or surviving partner.

**Same—Dissolution by Death and by Retiring of One Partner—Difference—Notice.**

The only difference between a dissolution of a partnership by death, and by a partner retiring, is, that in the latter case, the retiring partner must give notice of the dissolution to former customers, to free himself from liability to them, while in the case of a dissolution by the death of one of the partners, no such notice is necessary to free his estate from such liability.

Same—Liability of Estate of Deceased Partner—How Exonerated.

As a general rule the estate of the deceased partner remains liable for the debts which affected him at the time of his death. It may be exonerated from this liability if the subsequent dealings of the creditors with the surviving partner have been such as to shew that they have consented to shift the obligation to pay, from the estate of the deceased partner, and to accept the surviving partner for their sole debtor. But this inference will not be lightly made, and certainly not from the mere circumstance, that the creditor has continued a loan, or an account with the surviving partner.

Upon a writ of supersedeas to a judgment of the circuit court of the city of Richmond.

The facts of the case are fully stated by Judge Barton in his opinion.

*John Howard,* for the plaintiff in error.

*Jones & Bouldin* and *Guy & Gilliam,* for the defendants in error.

BARTON, J., delivered the opinion of the court.

This was an action of assumpsit, instituted on the 3d October, 1868, by the firm of Harveys & Williams against Mrs. America H. Glazebrook, executor of Larkin W. Glazebrook, dec'd, for the recovery of a large balance alleged to be due to the plaintiffs from the firm of George W. Gilliam & Co., of which Larkin W. Glazebrook was a member at the time of his death.

The declaration contained only the common counts. The bill of particulars, which was in the shape of an account current, was composed of items of merchandise sold, a balance due on account rendered 1st July, 1866, and advances of cash, or acceptances of Harveys & Williams for a large amount, principally before the death of Glazebrook, which happened on the 28th of October, 1866. These advances

are shown by the evidence to have been made under the following circumstances.

An arrangement was concluded in the early summer of 1866, between the firms of George W. Gilliam & Co., Harveys & Williams, and Wm. T. Coleman & Co., of New York, by which George W. Gilliam & Co. were to ship certain brands of tobacco manufactured by them to Wm. T. Coleman & Co., in New York, to be sent by them to a branch of their house in San Francisco, for sale. The New York house, upon these shipments being made, were to make advances, through Harveys & Williams, to the amount of sixty-five cents per pound on the brand of "Winesap," which was the highest grade, and proportionately on the lower grades. The tobacco was to be sold by the house of Wm. T. Coleman & Co., in San Francisco, to as much advantage as possible, and not to be sacrificed by hasty sales to meet advances, or by auction.

The nett proceeds of sales in gold to be remitted by telegraph transfers to Wm. T. Coleman & Co., in New York, who were to be allowed seven and a half commission for sale and guaranty of payment, and also seven per cent. (the New York rate) on advances, and payments made by them in New York for freight, insurance and other charges. If the nett proceeds should be insufficient to meet the advances, charges and interest, Harveys & Williams, who were allowed by Wm. T. Coleman & Co. two and a half of the seven and a half commission they were to receive were to pay the differences in New York.

After this arrangement was made, Gilliam & Co. shipped, in July and August, 1866, commencing on the 17th July, a large amount of tobacco to Coleman & Co. All of this tobacco was shipped to the house in San Francisco and was sold after the death of Glazebrook, the nett proceeds being remitted in gold by telegraph transfers as agreed.

The course of business of Messrs. Harveys & Williams in regard to the advances on this tobacco, agreed to be made through them seems to have been quite irrespective of the state of accounts between them and Gilliam & Co. on the one hand, and Coleman & Co. on the other.   For on the 6th July, before any shipment had been made, they gave their acceptance at sixty days for $5,000 to  Gilliam & Co.   On the 18th July, they advanced in cash $3,000; on the 19th, $6,000; on the 23d July, $4,000 ; while they are charged in account with Coleman & Co. $10,000, paid on their draft the 19th July, and with $6,682.40 for draft paid on the 26th July.   During the month of August they paid to Gilliam & Co. $10,000 at four different times, commencing on the 9th. And on the 27th August, Coleman & Co. paid their draft for $10,000 ; and on the 30th another for $3,650.   On the 27th September they gave their acceptance at sixty days to Gilliam & Co. for $2,000, having at the time, in their hands, received from Coleman & Co. an amount more than sufficient to meet that demand of Gilliam & Co.

The moneys received by them from Coleman & Co. were not entered to the credit of Gilliam & Co., even on their own books, but were put in bank to their own credit and mingled with their own funds.

The account of the tobacco shipped to San Francisco, was not closed until February, 1868, when it appeared that the nett proceeds of sale fell short of the advances made to Harveys & Williams, charges and interest by almost $10,000, which deficit was paid by them to Coleman & Co. in New York.

After the death of Glazebrook, Harveys & Williams continued their dealings with Gilliam the surviving partner of George W. Gilliam & Co., making to him advances of money, now claimed to have been, to the extent of $3,650, the balance of the moneys on hand at Glazebrook's death, received

from Coleman & Co. selling merchandise, and seem to have made a joint shipment of tobacco, which resulted in a loss. Among the credits given in the account current filed as the bill of particulars, is one for $9,999.19, the nett proceeds received after, of a shipment of tobacco made before Glaze-brook's death, through Harveys & Williams to Josiah Macy & Sons.

The plaintiffs on the 3d August, 1868, had brought another action of assumpsit, on the same account current, against George W. Gilliam as the surviving partner of himself and Glazebrook composing the firm of George W. Gilliam & Co., in which judgment was entered by confession on the 16th November, 1868, for the sum of $9,544.60 with interest from 18th February, 1868.

The jury in this case returned a verdict for exactly the same amount; thus holding Glazebrook's estate liable precisely as the surviving partner was liable.

During the progress of the trial, various exceptions were taken to the rulings of the court in regard to evidence offered, instructions asked, and also, to the refusal of the court to set the verdict aside and grant a new trial.

Such of the questions presented by these bills of exceptions and in the argument before us, which was elaborate and able, as were deemed important, have been considered.

The first of these questions is, Whether an action at law upon an unsettled account with a partnership can be maintained against the personal representative of a deceased partner?

It is conceded, that it could not at common law, and can only be now, if at all, under the provision introduced into the Code of 1849, at the instance of the revisors, and now to be found in the 13th sec. of chap. 144, page 629 of the Code of 1860, which is as follows: "The representative of one bound with another, either jointly or as a partner, by

judgment, bond, note or otherwise, for the payment of a debt, or the performance or forbearance of an act, or for any other thing, and dying in the lifetime of the latter, may be charged in the same manner as such representative might have been charged, if those bound jointly or as partners, had been bound severally as well as jointly, otherwise than partners."

The provision in the Rev. Code of 1819, ch. 98, sec. 3, 1st vol., page 359, for which the above was substituted, was as follows : "The representative of one jointly bound with another for the payment of a debt, or for the performance or forbearance of any act, or for any other thing, and dying in the lifetime of the latter, may be charged by virtue of such obligation in the same manner as such representative might have been charged if the obligors had been bound severally as well as jointly."

The Revisors say in their report, p. 723, "there was some difficulty in Roane's adm'r v. Drummond's adm'r, 6 Ran. 182, upon the letter of the statute, as to a joint judgment. The section as drawn above, conforms in the letter to what the court, in that case, said was the spirit of the statute. Perhaps the words 'bound' and 'obligors' might by themselves furnish some ground for an argument that the statute did not extend to debts of less dignity than specialties. To remove all ground for any such question, the words 'note or otherwise' are inserted in the section as proposed above."

This change in the language removes the difficulties referred to by the Revisors, and makes the statute apply to all joint contracts, whatever may be the form in which they are framed.

It will be seen that partners were not embraced in the provision of the Rev. Code of 1819. The Revisors say in their report, page 724 : "The opinion expressed in the court of appeals in Sale v. Dishman's ex'ors, 3 Leigh 553, and

Galt v. Calland's ex'ors, 7 Leigh 608, that the liability of a deceased partner cannot be made to affect his estate even in equity, until the surviving partner becomes insolvent, is not in accordance with the rule which now prevails in England. The case of Wilkinson v. Henderson, 1 Mylne & Keene 582 (7 Con. Eng. Ch. Rep. 173), shows the rule there. In that case the master of the rolls (Sir Jno. Leach) whose opinion I will quote a little more fully than is done by the Revisors, says : "All the authorities establish that in the consideration of a court of equity, a partnership debt is several as well as joint. The doubts upon the present question seem to have arisen from the general principle that the joint estate is the first fund for the payment of the joint debts, and that the joint estate, vesting in the surviving partner, the joint creditor, upon equitable considerations, ought to resort to the surviving partner before he seeks satisfaction from the assets of the deceased partner. It is admitted, that if the surviving partner proves to be unable to pay the whole debt, the joint creditor may then obtain full satisfaction from the assets of the deceased partner.'' "After stating the question to be 'whether the joint creditor shall be compelled to pursue the surviving partner in the first instance, and shall not be permitted to resort to the assets of the deceased partner, until it is established that full satisfaction cannot be obtained from the surviving partner; or whether the joint creditor may, in the first instance, resort to the assets of the deceased partner, leaving it to the personal representatives of the deceased partner to take the proper measures for recovering what, if any thing, shall appear upon the partnership accounts, to be due from the surviving to the estate of the deceased partner' pronounces his decision upon this question in the following terms :

'Considering that the estate of the surviving partner is, at all events, liable to the full satisfaction of the creditors,

and must first or last, be answerable for the failure of the
surviving partner ; that no additional charge is thrown upon
the assets of the deceased partner by the resort to them in
the first instance, and that great inconvenience and expense
might otherwise be occasioned to the joint creditors ; and,
further, that according to the two decisions in Sleech's case,
in the cause of Devaynes v. Noble, the creditor was per-
mitted to charge the separate estate of the deceased partner,
which, in equity, was not primarily liable as between the
partners, without first having resort to dividends which
might be obtained by proof, under the commission against .
the surviving partner.   I am, of opinion that the plaintiff is
entitled in this case to a decree for the benefit of himself,
and all other joint creditors, for the payment of his debt out
of the assets of Shepherd, the deceased partner.'   This de-
cision has since been followed in Braithwaite v. Britain, 1
Keen. 206 (15 Con. Eng. Ch. Rep. 207).

Mr. Lindley says the principle has never been questioned
since Sir Jno. Leach's decision.

When it is thus established that a creditor of a firm is
entitled in equity to a decree against the representative of a
deceased partner, without proving the surviving partner to
be insolvent, we can see no good reason for requiring the
creditor to go into equity, when his demand is of such a na-
ture that, but for the death which has occurred, he might
have proceeded at law.   Hence we propose to authorize a. ·
debt due from a firm, to be recovered from the representative,
of a deceased partner, at law or in equity, as it might have
been recovered from the partner if he had not died."

The general assembly having adopted this section as framed
by the Revisors, it is clear that in this state the representative
of a deceased partner may be sued at law for any legal de-
mand for which the deceased partner might have been sued,
if alive.   If Glazebrook had dissolved the partnership on

the 28th October, 1866, and given due notice to the plain-
tiffs, as suit could have been maintained against him at law,
for any legal demand against the partnership existing at the
time of the dissolution; this statute allows such suit to be
maintained against his personal representative. The liabil-
ity of a retiring partner and of the estate of a deceased
partner as to acts done and obligations already incurred are
identical. Neither is liable for the subsequent dealings of
the remaining or surviving partner. The only difference
between the effect of the dissolution in the one case from
the other, being that notice must be given in that of the re-
tiring partner to free him from liability for subsequent
dealings with an existing or former customer of the partner-
ship, while no such notice is required in the case of dissolu-
tion by death to exempt the estate of the deceased partner.
Lindley on Partnership, 325, 329.

While the ultimate liability for legal demands of creditors
of the retiring or surviving partner, and the estate of the
deceased partner were the same; before this statute that lia-
bility must have been enforced by different procedures, by
a suit at law against the former, and in equity against the
latter, which could not be maintained in Virginia until the
insolvency of the surviving partner had been shown. Since
this statute the procedure may be the same as well as the
liability.

The creditor, however, is not required to proceed at law,
for a legal demand against the personal representative of a
deceased partner. The statute is permissive, not compulsory.
The remedy in equity is, in many cases, the more convenient
and complete, may secure more effectually the ends of justice,
and prevent a multiplicity of suits, as resort would still be
necessary to a court of equity after the judgment at law to
obtain its satisfaction.

The case before us may serve for an example of the more

1 Va Dec—18

convenient adaptation of a court of equity for its settlement, than a court of law. It presents complicated accounts, requiring patient investigation and calculations, items of charge and credit depending upon different states of facts, and different legal principles, which could be more accurately adjusted and applied by a chancellor upon a master's report, than in a trial before a jury. The plaintiffs had a right to sue at law, and have elected to do so.

It is contended by.the counsel for the plaintiff in error, that the plaintiff in the court below having taken a judgment against the surviving partner for the same cause of action, that judgment was a merger of the debt of the partnership. It is only necessary in response to this to call attention to the terms of the statute, by which it is provided that the representative of a deceased partner may be charged in the same manner as if the obligation had been several at law as it always has been considered in equity. No such merger ever ensued at common law in the case of a judgment against one on a several obligation of more than one.

It is also contended, that under the agreement between the parties, the consideration for the guaranty of Harveys & Williams to Coleman & Co. passed solely from the latter firm, and that it is to be considered as an independent undertaking on their part, with which Gilliam & Co. had no connection, who were, therefore, not liable to any action founded upon its performance.

If that guarantee had been made under a separate and distinct contract with and upon a consideration passing solely from Coleman & Co., the conclusion sought might be conceded. But the guarantee of Harveys & Williams was one of the terms of the joint contract between three firms. It is impossible to make the complete separation necessary to the construction contended for, or to say, that the consideration passed solely from Coleman & Co.

Besides, this action is not founded upon the performance of that guarantee by Harveys & Williams. It is upon the advances as made by themselves. Neither the declaration nor the bill of particulars refer to that guarantee. Their claim is for the moneys received from them, without regard to the source whence derived by them—whether from their own funds or from Coleman & Co. I think they had a right, under the agreement, so to treat them. If they had money, which they wished to lend, they had the right to make advances to Gilliam & Co. themselves, and were not compelled to draw it from Coleman & Co., who were bound only to advances as required. They could not impose on Gilliam & Co. any additional obligation or deprive them of any right. If, as contended, their guarantee was a separate and distinct contract with which Gilliam & Co. had no concern, then it would follow that Gilliam & Co. could not set it up as a defence to any reclamation sought from them by Coleman & Co.—not being separate and distinct, the privity of the parties under the joint contract would have justified Harveys & Williams, as between themselves and Gilliam & Co., in making the advances themselves, and authorizing them now to treat these advances, they having satisfied Coleman & Co., as if they had been made by themselves and without the receipt of a dollar from Coleman & Co., and Gilliam & Co. are in no wise injured or affected by it. They have to account only for the moneys they received, and it can make no possible difference to them whether they account to one or the other of the parties to the joint contract under which it was received.

The verdict of the jury upon which judgment was rendered was for the full amount claimed in the plaintiffs' bill of particulars, after making some deductions agreed on in taking judgment against George W. Gilliam, the surviving partner.

The facts are not the same, nor are the legal principles, as to all the items. Those items begin with a balance per

account rendered on the 1st July, 1866, and end with an interest account brought down to February 18th, 1868, at which time the accounts with Coleman & Co. for the tobacco shipped to San Francisco, was closed. There are items charged, after the dissolution by the death of Glazebrook, for merchandise sold and money paid. A large part of the money paid to Gilliam ($3,650) is claimed by the plaintiffs to have been advanced in pursuance of the agreement in regard to the tobacco shipped to San Francisco, which had been received by them from Coleman & Co. prior to the death of Glazebrook, and which, they insist, the surviving partner was thereby entitled to receive. And they also claim, that even, if, as to that agreement the account is to be closed at the death of Glazebrook, they were entitled to apply the moneys received by them subsequently to their advances to the surviving partner, from the shipment to Josiah Macey & Sons, to the payment of those advances, so that the result of the account would remain the same.

I do not think that either of these pretensions can be sustained.

It is universally conceded that a surviving partner has no right to bind the estate of his deceased partner by any new transaction. And, whether the power is derived from the "continuance of the partnership, after dissolution in a qualified and limited sense" as it is usually expressed, or as suggested by Mr. Lindley as a more accurate expression from "an implied authority notwithstanding the dissolution," he has the power "to bind the firm so far as may be necessary to settle and liquidate existing demands, and to complete transactions begun, but unfinished, at the time of dissolution. Lindley on Parts. (333).

To illustrate this completion of a transaction, reference may be made to the case of Butchart v. Dresser, 10 Hare 453, which goes further, says Mr. Lindley, than any other

case. In that case, two persons in partnership as share-brokers, contracted to buy shares. Before paying for them they dissolved partnership, and the fact was known to their bankers. The purchase-money was obliged to be paid at once, or the shares sold. After the dissolution, one of the partners pledged the shares to the bankers for the money to pay for their purchase, and authorized the bankers to sell the shares to indemnify themselves. The money raised on the shares was applied to the payment of the purchase-money. Not being able to refund the money to the bankers, the shares were sold by them. The retiring partner filed his bill, contending that this was done without his authority, and that as the bankers knew of the dissolution, they were responsible to him for the shares. The Vice Chancellor, however, held that the partner who pledged the shares had authority, after the dissolution, to complete the contracts previously made by the firm ; that he, therefore, necessarily had authority to raise the funds to pay for the shares in question, and that he had not gone beyond his authority in raising the money by pledging them with the bankers as he had done. Upon appeal his decision was confirmed by the Lords Justices. 4 De G. M. and G. 542.

In his comments upon this case, Mr. Lindley remarks, "It is to be observed that in Butchart v. Dresser, nothing was done except for the purpose of completing a transaction unfinished at the time of the dissolution. At the utmost, it decides that in the event of a dissolution, it is competent for one partner to dispose of the partnership assets for partnership purposes. But neither Butchart v. Dresser, nor any other case, shows that a person who knows that a partnership is dissolved, can hold one partner liable for acts of his late co-partners done subsequently to the dissolution, and without authority ; and if in Butchart v. Dresser, the money to pay for the shares had been raised by a bill, it could not, consistently with prior decisions, have been held that the

dissolved firm was liable, either upon the bill itself, or for the money raised by its means."

If in the case before us, George W. Gilliam & Co., before the dissolution, had sold a lot of tobacco, the surviving partner could have delivered it and received the purchase-money. If, after receiving the tobacco, one of the firm of Coleman & Co. had died before the advance they had agreed to make had been fully made, the surviving partners would have been bound to complete them.     If, after receiving the money from Coleman & Co., one of the firm of Harveys & Williams had died, the survivors would have been bound to pay the money received to Gilliam & Co., and would have continued liable on their guarantee.     And the estate of the deceased partner would have been bound by the acts of the survivors, for they would have been liabilities existing at the time of the dissolution.     By the agreement and course of business, Gilliam & Co. had given implied, if not express authority to Harveys & Williams, to receive the full amount of the advances agreed on.     And the estate of the deceased partner was liable to Coleman & Co. for the whole amount which had been received by Harveys & Williams as their agents, at the time of the dissolution.     That was an existing debt to Coleman & Co.     But the case of Harveys & Williams is different.     They are not suing the right of Coleman & Co., but for the advances made by themselves.     They cannot occupy inconsistent positions.     They received the money from Coleman & Co. not only, not at the special instance of Gilliam & Co., but without their knowledge.     They did not act as the bankers of the latter.     The money received by them was not placed to the credit of Gilliam & Co. on their books, to be drawn by check.     But they placed it to their own credit, as received, and mingled it with their own funds ; and nearly a month after the last was received, instead of meeting a demand of Gilliam & Co. for $2,000 in money, they gave an acceptance at sixty days.

Whatever might have been the rights of Gilliam & Co. against them, they cannot be heard to assert now that they held the money of Gilliam & Co. in their hands, or that they had any claim against them by reason of the money in their own hands, and not paid over, at the time of the dissolution, which fact from the record seems to have been concealed from Gilliam & Co.

The most they can say is, that they were under an agreement to lend. The loan made afterwards was a new transaction as far as Glazebrook's estate was concerned. The surviving partner had no right to borrow money and bind the estate of the deceased partner for its repayment. It was not the less a 'loan' because it had been previously agreed to be made, nor even if that agreement to lend was for consideration passed. Even in the extreme case of Butchart v. Dresser, it was only held that after the dissolution one partner had the right to pledge specific personal property to raise its purchase-money, which was properly applied. It was not suggested that he could bind the other partner personally for the money raised. In this case it is not even shown that the money borrowed by the surviving partner, after the dissolution, was applied to partnership purposes.

To hold the estate of the deceased partner bound for the money thus advanced to the surviving partner, would extend the responsibility of partners for the acts of each other performed after dissolution, beyond what has ever been heretofore done, and to a dangerous and pernicious degree. If a surviving partner pays more than his share of the debts, his creditors may, perhaps, by proper procedure in equity, obtain relief against the estate of a deceased partner. But such creditor cannot proceed in a court of law against the representative of a deceased partner, even though the money borrowed from him had been applied by his debtor to the

payment of partnership debts ; any more than a creditor, from whom, one of several joint obligors had borrowed money to pay off the joint debt, could sue the others in an action at law for the money lent.

But it is contended that Harveys & Williams having received subsequently to these advances to the surviving partner, moneys of George W. Gilliam & Co., have the right to apply those moneys first, to the payment of those advances.

If, upon the death of Glazebrook, they had opened a separate account with the surviving partner, and had received individual moneys of his, such claim could be sustained. Instead of that, however, they kept no separate accounts, but blended the old and new transactions in the same account in which this suit is brought ; and if they had received individual money from the survivor, which was credited generally in the account, such credits would be applied to the oldest items of debt.    See Clayton's case, in Devaynes v. Noble, 1 Mer. 604 ; Simpson v. Ingham, 2 B. & Cr. 29.

But in this case the money received by them was the proceeds of partnership assets, and not the individual property of the survivor, which it would have been a fraud upon the deceased partner to apply to the individual debt of the survivor.

It is contended for the plaintiff in error that Harveys & Williams having continued their dealings with the surviving partner as if no change had taken place, such dealings discharged the estate of the deceased partner from all liability.

As a general rule, the estate of the deceased partner remains liable to the debts which affected him at the time of his death.    Vulliamy v. Noble, 3 Mer. 619 ; Sleech's Case, in Devaynes v. Noble, 1 Mer. 566.

It may be exonerated from this liability, if the subsequent dealings of the creditors with the surviving partner have been of such a nature as to show that they have consented

to shift the obligation to pay from the estate of the deceased partner, and to accept the surviving partner for their sole debtor. *Ex parte* Kendall, 17 Ves. 519–526. But this inference will not be lightly made, and certainly not from the mere circumstance that the creditor has continued to carry on an account with the surviving partner. Palmer's case, in Devaynes v. Noble, 1 Mer. 624.

There is nothing in this case from which any such inference can be drawn. It was clearly not the intention of the parties to discharge the estate of Glazebrook, and look to Gilliam as their sole debtor. So far from it, the mode of dealing, of keeping the accounts, and the other incidents of the case, show the purpose and intention, not only to hold the estate of the deceased partner liable for the debt existing at the time of his death, but to extend that liability to all the subsequent transactions.

The defendant below objected to an item in the account of $171.35, with the evidence to support it being allowed to go to the jury. The facts stated in the bill of exceptions show that in the lifetime of Glazebrook, Harveys & Williams, as the agents of Gilliam & Co., sold a lot of tobacco to Snowden & Rives, receiving the purchase money, for which they accounted to Gilliam & Co.

After Glazebrook's death, Snowden & Rives made reclamation upon Harveys & Williams for damage to the tobacco. After investigation by the surviving partner, the claim was admitted by him to be just. Harveys & Williams thereupon paid the money and charged it in their account with Gilliam & Co. This claim was properly allowed to go to the jury. It was a liability existing, though not asserted, and possibly not known, at the time of the dissolution. And the adjustment of such liabilities is within the authority of the surviving member of the firm, which was ultimately liable.

There is another feature in the account on which this suit

was brought which requires notice.    The interest seems to have been calculated on both debits and credits upon a rate beyond what was allowed by law.    That Coleman & Co. could charge seven per cent. lawfully upon their payments is no reason for that being the rate charged by Harveys & Williams, who are not claiming under Coleman & Co., but as being themselves the principals.

I think the judgment should be reversed, the verdict set aside, and the cause remanded for a new trial.

WINGFIELD, P., and McLAUGHLIN, J., concurred in the opinion of BARTON, J.

Judgment reversed.